Lisa J. Rodriguez
**DILWORTH PAXSON LLP**
457 Haddonfield Road, Suite 700
Cherry Hill, NJ 08002-1165
Tel: (856) 674-1926
lrodriguez@dilworthlaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMES GARRETT, CHRISTOPHER ROACH, DEMARIS MARTZ, MARCUM MARTZ, KIMBERLY ROHRBERG, ROBERT DONNELLY and TAYLOR PADDOCK on behalf of themselves and all other similarly situated, | Civil Action No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SUBARU OF AMERICA, INC. and SUBARU CORPORATION, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs James Garrett, Christopher Roach, Demaris Martz, Marcum Martz, Kimberly Rohrberg, Robert Donnelly and Taylor Paddock, by their attorneys, allege for their class action complaint the following, on behalf of themselves and all others similarly situated based on personal knowledge as to their own vehicles and upon information and belief as to all other matters.

## PRELIMINARY STATEMENT

1. Plaintiffs bring this action on behalf of themselves and all similarly situated persons ("Class Members") in the United States who purchased or leased any Subaru vehicles identified herein whose telematics equipment was rendered wholly or partially inoperable when the major wireless carriers phased out "3G" beginning in early 2022 ("Class Vehicles"). The

Class Vehicles' internet-enabled features which include Automatic Collision Notification; Enhanced Roadside Assistance; Emergency Assistance Button; Stolen Vehicle Locator; and Bluetooth Hands-Free Calling, *inter alia*, ("3G Features") were rendered inoperable after 3G was phased out by carriers and replaced with 4G and/or 5G due to Defendants' use of obsolete telematics equipment they installed in the Class Vehicles. The allegations herein are based on personal knowledge as to Plaintiffs' own experiences and are made as to other matters based on an investigation by counsel, including analysis of publicly available information.

2.      This action was commenced to obtain refunds of overpayments and/or recompense for diminution in value, and/or the cost to replace the telematics features in Class Vehicles were rendered inoperable when 3G was phased out.

## **PARTIES**

3.      Plaintiff James Garrett is a resident of the State of Michigan who purchased a 2019 Subaru Legacy and continued to own the same at all times relevant herein.

4.      Plaintiff Christopher Roach is a resident of the State of New York who purchased a 2019 Subaru Outback and continued to own the same at all times relevant herein.

5.      Plaintiff Demaris Martz is a resident of the State of California who purchased a 2017 Subaru Outback and continued to own the same at all times relevant herein.

6.      Plaintiff Marcum Martz is a resident of the State of California who purchased a 2017 Subaru Outback and continued to own the same at all times relevant herein.

7.      Plaintiff Kimberly Rohrberg is a resident of the State of Washington who purchased a 2019 Subaru Legacy and continued to own the same at all times relevant herein.

8.      Plaintiff Taylor Paddock is a resident of the State of Florida who purchased a 2019 Subaru Outback and continued to own the same at all times relevant herein.

9.      Plaintiff Robert Donnelly is a resident of the State of New York who purchased a 2016 Subaru Outback and continued to own the same at all times relevant herein.

**DEFENDANTS**

**A.  Subaru Corporation**

10.      Defendant Subaru Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan. Subaru Corporation is the parent company of Defendant Subaru of America, Inc. Subaru Corporation has substantial control over Subaru of America, and Subaru of America acts for the benefit of Subaru Corporation.

11.      At all relevant times, Subaru Corporation acted in the United States by itself and through Subaru of America and its other various entities, including in the State of New Jersey. Subaru Corporation, itself and through Subaru of America and its other entities, is in the business of designing, engineering, testing, validating, manufacturing, marketing, and selling Subaru branded vehicles throughout the United States, including within the State of New Jersey.

**B.  Subaru of America[1]**

12.      Defendant Subaru of America is a wholly owned subsidiary of Subaru Corporation with its principal place of business in Camden, New Jersey.

13.      At all relevant times, Subaru of America was in the business of distributing, marketing, selling, and servicing Subaru branded vehicles in the United States, including within the State of New Jersey.

14.      Subaru of America is the corporate parent of all relevant Subaru entities, including but not limited to North American Subaru, Inc. located in the State of New Jersey.

---

[1] Throughout this Complaint, "Subaru" shall be meant to refer to both Subaru Corporation and Subaru of America.

15.     Subaru employs engineering, legal, compliance, and regulatory personnel to make decisions regarding these brand vehicles. These employees, on behalf of Subaru Corporation and Subaru of America, ultimately made or ratified the decisions that allowed the subject Class Vehicles to be designed, manufactured, marketed, and sold with only 3G telematics systems.

## FACTUAL ALLEGATIONS

16.     Subaru operates eight regional distribution offices, three regional offices, 12 zone offices, and more than 600 retailers across the United States.

17.     Subaru designs, manufactures, markets, and sells its Subaru branded vehicles across the United States, including in Plaintiffs' states.

18.     In 2022, Subaru sold 556,581 vehicles in the United States.[2]

19.     Subaru has branded itself as the maker of safe and dependable vehicles and has spent millions, if not billions, of dollars on extensive marketing and advertising campaigns to cement the association of safety, reliability, and durability with its Subaru brand automobiles, including the Class Vehicles.

20.     The Defendants collectively designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the Class Vehicles equipped with the defective 3G only telematics, thereby overcharging Plaintiffs and Class Members for the Class Vehicles and subjecting Plaintiffs and Class Members to safety risks, increased costs and damaging the value of Plaintiffs and Class Members vehicles as further detailed below.

## JURISDICTION

---

[2] https://www.prnewswire.com/news-releases/subaru-of-america-inc-reports-december-and-2022-year-end-sales-results-301713699.html#:~:text=With%20five%20consecutive%20months%20of,compared%20with%20calendar%20year%202021 (last visited May 19, 2023).

21.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332(d) and 1453, because (1) this action is a "class action," which contains class allegations and expressly seeks certification of a proposed class of individuals; (2) the putative Class consists of more than one hundred proposed class members; (3) the citizenship of at least one class member is different from one Defendant's citizenship (Japan), and (4) the aggregate amount in controversy by the claims of Plaintiffs and the putative Class exceeds $5,000,000, exclusive of interest and costs.

22.    Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this District, and the actions of the Defendants' that give rise to the claims against them in this action took place in part at least in this District.

## CLASS ACTION ALLEGATIONS

23.    Plaintiffs re-allege and incorporate the allegations contained in the paragraphs above.

24.    Plaintiffs bring this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a Class and state subclasses consisting of:

> All persons who purchased or leased, anywhere in the United States, Subaru vehicles (collectively the "Class Vehicles") as follows:

| YEAR | MODEL |
|------|-------|
| 2016 | Subaru Forester |
| 2017 | Subaru Forester |
| 2018 | Subaru Forester |
| 2019 | Subaru Forester |
| 2016 | Subaru Legacy |
| 2017 | Subaru Legacy |
| 2018 | Subaru Legacy |
| 2019 | Subaru Legacy |
| 2016 | Subaru Outback |
| 2017 | Subaru Outback |
| 2018 | Subaru Outback |
| 2019 | Subaru Outback |

| 2016 | Subaru Impreza |
|------|----------------|
| 2017 | Subaru Impreza |
| 2018 | Subaru Impreza |
| 2019 | Subaru Impreza |
| 2016 | Subaru Crosstrek |
| 2017 | Subaru Crosstrek |
| 2018 | Subaru Crosstrek |
| 2019 | Subaru Crosstrek |
| 2016 | Subaru WRX |
| 2017 | Subaru WRX |
| 2018 | Subaru WRX |
| 2019 | Subaru WRX |

25. Plaintiffs reserve the right to amend the definition of the Class and subclasses.

26. This action is properly maintainable as a class action.

27. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among questions of law and fact common to the Class are:

> a. Whether Defendants misrepresented the 3G only limitations on certain features of Class Vehicles;
>
> b. The extent of the features which became inoperative when 3G was phased out;
>
> c. Whether Defendants in their marketing and sale of the cars violated the New York General Business Law Section 349 and similar laws of other states in which the vehicles were sold;
>
> d. Whether Defendants breached express and/or implied warranties when they designed, manufactured and sold cars with telematics systems with the 3G only limitations;
>
> e. Whether Defendants' breach of their warranties constitutes a violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §2310(d)(1(A);

      f.   The extent of damages/diminution in value/overcharges resulting from the 3G only limited telematics in the Class Vehicles.

28.    Plaintiffs' claims are typical of the claims of each member of each of the Class in that Plaintiffs allege a common course of conduct by Defendants toward each member of the Class.  Specifically, Defendants violated the federal law, warranty law, and various consumer protection laws of certain states and breached its warranties with each member of the Class. Plaintiffs and the other members of the Class seek identical remedies under identical legal theories.  There is no material factual variation between Plaintiffs' claims and those of the Class.

29.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel who have extensive experience prosecuting class actions and who, with Plaintiffs, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiffs have no interest adverse to the Classes.

30.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Furthermore, the damage that has been suffered by any individual Class member is likely not enough to sustain the expense and burden of individual litigation.  Hence it would be impracticable for all members of the Class to redress the wrongs done to them individually.  There will be no difficulty in the management of this action as a class action.

31.    The prosecution of separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to the individual Class members, which could establish incompatible standards of conduct for Defendants. In addition, adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of the

interests of the other members of the Classes not parties to such adjudications, or could substantially impede or impair their ability to protect their interests.

32.    The members of the Class are readily identifiable through Defendants' records.

33.    Defendants have acted on grounds generally applicable to the Classes with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Classes as a whole.

## SUBSTANTIVE ALLEGATIONS

34.    The effect of the 3G phase out on 3G only cars has been the subject of much critical commentary.

35.    Consumer Reports succinctly described the situation:

> "As wireless carriers shut down their 3G networks over the coming months, millions of cars are losing the ability to automatically contact first responders after a crash…
> Automatic crash notification, which alerts first responders via a built-in cellular connection, often relies on aging 3G cellular networks to connect drivers with emergency services and share a vehicle's location. Even though automakers have been aware that these networks are shutting down permanently between February and July, many manufacturers still relied on it until as recently as the 2021 model year.

> "Shutting down the 3G network to prioritize newer technologies is positive in the long run," says Alex Knizek, an automotive engineer at CR. "But it is disappointing that some automakers have failed to offer a solution to owners of 3G-connected vehicles, leaving them unable to take advantage of proven and valuable safety features, as well as other beneficial connectivity functions."

> The reason is cost savings, according to Roger Lanctot, director of automotive connected mobility at Strategy Analytics, a consulting firm. "It's the last chapter of the automakers adopting the least-expensive connectivity module they can find," he says. Only recently did automakers start future-proofing newer models. "It's a challenge for the industry, but going forward, automakers recognize that they need to put the latest connectivity in."

In addition to crash notification, many vehicles also have an SOS button to contact emergency services, and a lot of those buttons still use a 3G network. It's usually red and located near the vehicle's dome light or rearview mirror. Some cars may also use 3G connectivity for convenience features such as remote unlocking, remote start, emergency roadside assistance, navigation map updates, and vehicle diagnostics. These and other features will no longer work without an upgrade to newer 4G or 5G technology. But because of the way many of these vehicles are designed, it can be difficult or even impossible to upgrade the technology to work with the newer networks, Lanctot says.

"What a mess," says William Wallace, CR's manager of safety policy. "Wireless carriers, federal regulators, and some automakers seem content to leave people out to dry, even if it means they lose access to a potentially lifesaving technology. Every automaker should deliver to its customers the services they've been promised—without charging them extra—and lawmakers should get ahead of the game to keep this from ever happening again in the future."

36.     Historically, sometime around 2009, as the public became increasingly aware of the capabilities and benefit of telematics, car buyers began to demand the connectivity feature from car makers. The benefits are tangible and include, *inter alia*, reduced insurance premiums and vehicle diagnosing capabilities which reduce service costs and fuel expenses. *See* https://www.incartelematics.com/faq-items/what-cars-have-telematics (March 2021) (last accessed May 19, 2023).

37.     As mobile carriers seek to upgrade their networks to use the latest technologies, they periodically shut down older outdated services, such as 3G, to free up spectrum and infrastructure to support new services, such as 5G.  Similar transitions have happened before. For example, some mobile carriers shut down their 2G networks when they upgraded their networks to support 4G services. Mobile carriers have the flexibility to choose the types of technologies and services they deploy, including when they decommission older services in favor of newer services to meet consumer demands.

38.     When 3G became available, Subaru installed 3G capable telematics in its vehicles but refused and failed to have the 3G telematics adaptable to the next "generation" of wireless. In the field of mobile connections, a "generation" generally refers to a change in the fundamental nature of the service, non-backwards compatible transmission technology, higher peak bit rates, and new frequency bands.

39.     All manufacturers of 3G devices have long known that 3G was "spectrally inefficient" and would be phased out as early as possible. In January 2008, the FCC auction for 700 MHZ spectrum began with Version Wireless and AT&T winning the biggest share after having stated their intentions to support LTE a/k/a 4G LTE.

40.     As early as August 2009, carriers supporting 3G began planning their upgrade to 4G LTE. On December 14, 2009 Telia Sonera became the first carrier to offer customers 4G services. *See* "First in the World with 4G Services," Telia Sonera Press Release December 14, 2009. Accordingly, Defendants knew of the imminent obsolescence of 3G and that industry standards were rapidly advancing.

41.     As early as 2010, Subaru announced certain vehicles would have 3G connectivity, allowing them to connect to wireless internet sources. *See* https://media.subaru.com/pressrelease/34/123/subaru-announces-mobile-wi-fi-access-available-2011 (last accessed June 10, 2023). Importantly, as early as 2015, Subaru began employing 4G LTE connectivity in its vehicles, while at the same time continuing to sell 3G only equipped vehicles. *See* https://media.subaru.com/pressrelease/712/1/subaru-selects-sirius-xm-connected-vehicle-services-help&searchresult (last accessed June 10, 2023).

42.     Subaru acknowledged that certain features would not continue to function once

3G was phased out. https://www.subaru.com/support/3g-network-retirement.html. Because of the 3G phase out, Subaru offered complimentary upgrades for vehicles with an active STARLINK Safety and Security Subscription. This upgrade would purportedly allow continued access to the STARLINK Safety and Security features. If a vehicle owner did not update their vehicle before the 3G connectivity was phased out, the STARLINK subscription was cancelled and any use of features requiring 3G would stop working.

43.     Subaru's complimentary upgrade with regard to STARLINK features did not fix the problem. Of the approximately 820,000 Subaru vehicles with 3G telematics, those with a STARLINK subscription only amounted to approximately 110,000 vehicles. This left a population of approximately 710,000 vehicles with a chance of experiencing various issues due to the loss of 3G connectivity.

44.     For example, the Data Communication Modules ("DCMs") in Subaru vehicles serve the purpose of connecting the vehicle to mobile networks or the internet, and the DCMs in 2016-2019 Subaru vehicles still make attempts to communicate with a 3G network. This attempt to connect uses significant battery power. When the DCMs are in the process of attempting a 3G connection, a parasitic battery draw occurs which drains the vehicle's battery at a rapid rate. The DC makes this attempt to communicate regularly, as often as every few hours, while the vehicle is turned off. The resulting battery draw can cause a no-start safety concern for the vehicle owner.

45.     By upgrading only those vehicles with STARLINK subscriptions, Subaru therefore left at least 710,000 vehicles at risk of experiencing a discharged or drained battery due to the car's DCM attempting to find a 3G network and make connection.

46.     One way to address the battery draw issue is to remove the DCM fuse in the

vehicle. This course of action, however, removes the Bluetooth Microphone capabilities (because the Bluetooth microphone is plugged in to the car's DCM) thus removing the driver's ability to conduct hands-free calling. Many purchasers took into account the fact that they would be able to safely and legally talk on the phone while driving through the use of hands-free calling, and now risk that feature being taken from them because of Subaru's failure upgrade the vehicles in a way that maintains the features customers value.

47.    Importantly, of the approximately 110,000 reprogramming events that Subaru conducted for STARLINK subscribers who chose to have their car reprogrammed, 10-12% of the DCMs physically failed the reprogramming because of software conflicts inside the DCM. Those DCMs then needed to be replaced entirely.

48.    The sunsetting of 3G was long foreseeable. For example, Verizon first introduced and expanded to national scale its 3G network in 2002-2004. This was followed by the launch of its 4G LTE service on December 5, 2010. In or around 2016, Verizon publicly announced 2019 as the deadline to sunset 3G, but later extended that to 2020 and again to 2022.[3] On March 31, 2021, Verizon finally announced that their 3G wireless network would be shut down at the end of 2022 in order to make way for the deployment of its 5G network.[4]

49.    The 3G phase out does not necessarily automatically disable all devices working on that protocol as it has in the Class Vehicles. For example, the iPhone 3GS can connect to Wi-Fi to access internet applications even after the 3G phase out. *See* https://www.zdnet.com/google-amp/home-and-office/_____/3g-is-shutting-down-here-are-the-gadgets-that-still-rely-on-it-do-you-have-one/ ZDNET, June Wan, April 8, 2022 (last

---

[3] Mike Haberman, *3G CDMA Network Shut off date set for December 31, 2022, Verizon News  Center,* https://www.verizon.com/about/news/3g-cdma-network-shut-date-set-december-31-2022.
[4] *Id.*

accessed June 2, 2023). Software upgrades have been developed to extend the connectivity life of 3G driven devices. Google's Pixel 2 was released in October 2017 with hardware/software that could support 4G LTE and had been pre-armed as early as March 2017. In addition, AT&T connected the iPhone 6 and Galaxy S4 Mini and later Samsung Galaxy models and Pixel 2 Goggle models, so that they will all continue to work after the 3G phase out. The same is true for certain older phones from Motorola and LG.

50.     While Subaru continued to install, promote, and sell the 3G-only devices through the end of the Class Period, the major cellular providers have been preparing for years and hence most mobile or smartphone customers are appropriately on the 4G and/or 5G network. *See* https://www.verify-this.com/article/mews/verify/technology-verify/you-will-have-to-upgrade-replace-phone-to4g-5g-in 2022-if-you-have-3gVerizon-att-T-Mobile-all-phasing-out-3g/635-e733678c-clcd-485d-9793-7f97c003bcb9  (last accessed June 2, 2023).

51.     Even after designing and installing the 3G telematics, a technology "fix" to address the 3G phase out was not impossible or even difficult for Subaru. While it may have been costly, Subaru had notice of the upcoming difficulties 3G would pose and it could have planned in advance by recalling cars and installing upgrades to add 4G and/or 5G capabilities.

52.     Defendants could have also integrated a swappable SIM card into the Subaru telematics module which would have allowed the system to upgrade itself to 4G LTE or 5G, but they chose not to do so.

53.     Defendants did not design, build, or install the vehicles to be able to transition to post-3G technology due to a desire to save on manufacturing costs.

54.     By contrast, General Motors, whose 2015 and later models of Chevrolet, Buick,

GMC, and Cadillac all had the proprietary "OnStar" hardware, which was also adversely impacted by 3G sunsetting, announced to its customers:

> In 2021, OnStar began working with AT&T on network updates and started executing over-the-air software updates to ensure Members were not impacted by the network transition.

GMC committed to automatically send "over-the-air" software updates free of charge to address the 3G phase-out.

55.     Moreover, the obsolescence issue was entirely foreseeable. Jeremy Barnes, a spokesperson for Mitsubishi, was quoted in Consumer Reports about the 3G phase out: "We foresaw this time coming and designed around it."

56.     Although Subaru, after years of promoting its 3G only vehicles, informed consumers that STARLINK subscribers would be able to receive a free reprogramming, there was no disclosure or even suggestion at the time of Plaintiffs' purchases that Subaru's telematics would be rendered obsolete once 3G was phased out or that the features were only temporary or had only a limited life. As to the later model years after 4G became prevalent, Defendants never disclosed that its equipment was one generation behind the standard. To the contrary, Defendants marketed the features as permanent features of the Class Vehicles.

**SUNSETTING OF 3G AND LOSS OF
CERTAIN FEATURES IN THE CARS**

57.     In February 2019, AT&T announced a plan to "sunset" its 3G network. See http://www.business.ATT.com/explore/make-the-switch.html (last accessed June 2, 2023). 3G "sunsetting" means that a mobile network operator (or carrier) shuts off the cellular infrastructure required to operate devices based on 3G technology. Verizon announced that its 3G shutdown would occur on December 31, 2022. Other carriers soon followed with their own announcements of phase-outs.

58.     Notwithstanding that announcement, Defendants sold hundreds of thousands of 3G only telematics equipped vehicles.

59.     Subaru's inoperable features include Automatic Collision Notification, SOS Emergency Assistance, Stolen Vehicle Recovery, Bluetooth Hands-Free Calling, and Remote Features such as unlocking and locking the vehicles. These features no longer function after February 2022 and any upgrades offered by Subaru to the small subset of vehicle owners who have a STARLINK subscription had to be completed by February 2022 in order to address the issues. For those STARLINK subscribers who took Subaru up on its offer to reprogram their vehicle, many faced the loss of Bluetooth Hands-Free Calling or had to entirely replace their DCM after the first repair failed. For many consumers, the vehicle's constant attempt to connect to the 3G network leaves their battery dead within a few hours.

### DEFENDANTS' CONCEALMENT AND OMISSIONS, OR OBSOLETE TELEMATICS, CAUSED LOSS AND DAMAGE TO PLAINTIFFS AND CLASS MEMBERS

60.     Had the Defendants truthfully disclosed and reported that the telematics for the Class Vehicles were 3G-only, consumers would have been less likely to purchase the cars, would have abstained outright, or would have sought substantial discounts and/or upgrades. As a proximate cause of Defendants' misrepresentations and warranty breaches detailed in this complaint, Plaintiffs and Class Members purchased Class Vehicles.

61.     Plaintiffs and the Class Members who purchased Class Vehicles did not get the benefit of the bargain they struck.  Instead, they received cars whose telematics had planned obsolescence and were therefore of lesser value because the telematics were destined for obsolescence as soon as the models were issued. The cars that Plaintiffs and the Class Members paid for and bargained to receive, while marketed as products with the most advanced

technologies, were of lesser value than as advertised. Accordingly, purchasers of the cars, including Plaintiffs and Class Members, have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the vehicles.

62.     The Defendants' misrepresentations and other conduct in designing, manufacturing, and selling cars with obsolete telematics and failing to truthfully disclose to prospective buyers that the cars were 3G-only caused Plaintiffs and Class Members substantial injury in the form of price premiums and overpayments for products, as well diminished resale value and loss of telematics benefits described herein.

## TOLLING

63.     **Tolling of the Limitations Period**: The Defendants had actual knowledge for several years that the marketing and advertising of its vehicles was deceptive and misleading.

64.     Continuing Act Tolling: Beginning in or around 2014, Defendants continuously marketed and sold the vehicles to unsuspecting car buyers. The Defendants continuously represented these vehicles could adapt to technology as needed. By continuously repeating these false representations and failing to disclose that the vehicles were 3G-only, the Defendants engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that Subaru might seek to apply.

65.     At all relevant times, the Defendants knew that they were concealing and misrepresenting material facts but continued to misrepresent and conceal information in its marketing and sales materials. Plaintiffs and Class Members' claims are not time-barred.

66.     **Fraudulent Concealment Tolling**: State consumer protection laws, together with

the doctrine of equitable tolling and/or the discovery rule, toll the applicable statutes of limitations for all class members because of Defendants' conduct, including but not limited to concealment and omission of material facts.

## THE WARRANTIES

67.    Subaru provided warranties directly to Plaintiffs and other purchasers of Class Vehicles which covered the Class Vehicles' 3G Telematics as more fully set forth herein.

68.    Defendants' New Vehicle Limited Warranty provides that "any repairs that are needed to fix issues related to original part/accessory defects, any faults in workmanship, or unforeseen problems under normal wear and tear" are covered.[5]

69.    Plaintiffs' and the other Class Members' Class Vehicles did not perform as promised and contained a flawed or defective modem which was nonfunctional after the decommissioning of the outdated 3G network. This issue was and should have been covered under the New Vehicle Limited Warranty.

70.    Defendants breached the terms of their express warranties with Plaintiffs and other Class Members by not providing the Class Vehicles with properly functioning modems and failing to repair or remedy the issue at Defendants' cost.

71.    Even the Defendants' attempt to address the issue by offering upgrades to certain vehicle owners was egregiously inadequate, as the upgrade was only available to a small subset of vehicle owners – those with STARLINK subscriptions – and the upgrades must have taken place by February 2022 and were not offered beyond that date.

72.    A warranty that the Class Vehicles, and their telematics equipment, were in

---

[5] See, e.g., https://www.primesubarumanchester.com/blog/2018/december/26/what-comes-in-the-subaru-outback-warranty.htm#:~:text=All%20new%202018%20and%202019,60%2C000%2Dmile%20powertrain%20limited%20warranty (describing what is included in the Subaru Outback New Vehicle Limited Warranty) (last accessed June 2, 2023).

merchantable condition and fit for the ordinary purposes for which they were sold is implied by law.

73.    Plaintiffs and the other Class Members purchased the Class Vehicles manufactured and sold by Defendants in consumer transactions.

74.    The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and were not fit for the ordinary purpose for which cars with installed telematics equipment are used because the inevitable decommissioning of the 3G networks would render the vehicle modem nonfunctional. The Class Vehicles left Defendants' possession and control with a modem of such a quality that rendered the vehicles unmerchantable and unfit for ordinary use. Plaintiffs and the other Class Members used their Class Vehicles in the normal and ordinary manner for which Class Vehicles were designed and advertised.

75.    Defendants knew before the time of sale to Plaintiffs and the other Class Members, or earlier, that the Class Vehicles were produced with a modem that was unfit for ordinary use and that would be decommissioned, which falls well short of an objective minimum standard of quality. This knowledge was based on Defendants' own knowledge of the decommissioning of the 3G network their modems relied on, its decision to include an alternate 4G modem in other vehicle models produced around the same time, the industry standard practice of making vehicle features that would not be affected by the 3G network shutdown, and Defendants' general knowledge regarding the manufacture of their vehicle modems and integrated systems and software.

76.    Subaru knew of imminent new generations of wireless technology and could have manufactured telematics adaptable to the next generation but failed to do so.

77.    Subaru could have but chose not to design, build, or install telematics with

downloadable software or physical spare parts which could allow the devices to continue to connect to the next wireless generations following 3G. Defendants had the capability to retrofit its 3G telematics and did so once 3G became prevalent technology but refused to design the 3G telematics to be retrofitted.

78.     Plaintiffs and Class Members justifiably relied on the Defendants to disclose the true nature of the cars they purchased, because the truth was not discoverable by Plaintiffs and the other class members through reasonable efforts. Any applicable statute of limitations has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

79.     Defendants are estopped from asserting that statutes of limitations were running for the duration of time the Class Members were unaware of Defendants' misrepresentations.

80.     Defendants are equitably estopped from asserting the statutes of limitations ran against the claims of Class Members.

81.     Additional information supporting the allegations contained herein is in the control of the Defendants.

82.     Material information concealed and/or actively suppressed by the Defendants includes but is not limited to the limitations of 3G-only vehicles described in the preceding paragraphs.

83.     Defendants had a duty to disclose to Class Members the 3G-only limitations.

84.     Defendants breached express and implied warranties and actively and affirmatively represented, concealed, and suppressed – both pre-sale and post-sale – the evidence of the 3G-only limitations.

## **DEFENDANTS' CONDUCT**

85.     The warranties accompanying the Class Vehicles were procedurally and substantively unconscionable under applicable state warranty laws because of the disparity in bargaining power of the parties and the purchasers' lack of knowledge that Class Vehicles had 3G-only limitations.

86.     The contractual terms were unreasonably favorable to the Defendants because the Defendants were fully aware of the 3G-only limitations, but proposed Class Members were unaware of these limitations. Thus, that information imbalance rendered the bargaining position of the Defendants for the sale of Class Vehicles grossly disproportionate and vastly superior to that of the individual purchasers, including the proposed class representative and Class Members.

87.     The Defendants' conduct in withholding the 3G limitations renders the Class Vehicles purchase contract so one-sided as to be unconscionable under the circumstances existing at the formation of the vehicle purchase contract.

88.     The durational limitation of the warranties and accompanying the Class Vehicles is unreasonable and unconscionable, as the Defendants actively concealed the 3G-only limitations in the vehicles. The proposed class representatives and Class Members had no notice of or ability to detect the issue.

89.     Defendants engaged in materially misleading practices.

90.     Defendants' unconscionable conduct precludes any exclusion of incidental and consequential damages or any other limitation of remedies. The Defendants' upper-level management orchestrated this wrongful conduct.

91.     The Defendants knew that their offer to replace the defective parts of the Class Vehicles would not adequately address the 3G-only limitations.

92.     Defendants knew that their offer to replace the defective parts of the Class

Vehicles was limited to a small subset of affected vehicles.

93.    The proposed class representative and Class Members operated and maintained their Class Vehicles in conformity with the respective owner's manual and Service and Warranty requirements.

94.    The Defendants violated the consumer protection laws of the various states noted herein with their unconscionable conduct described in this complaint, including but not limited to their failure to disclose material information that caused ascertainable financial harm to the proposed class representative and class members.

95.    The vehicle owners have sustained an ascertainable financial loss.  Individuals who own or have owned Class Vehicles also sustained diminution of the resale value of their Class Vehicles.

96.    The proposed class representative and Class Members have not received the benefit of their bargain concerning their respective purchase of Class Vehicles.

97.    If the proposed class representative and class members had been made aware of the 3G-only limitations in their respective Class Vehicles and the attendant ramifications of value, safety, and care, they would not have purchased the Class Vehicles or would have paid less for their vehicles.

98.    As a direct result of these knowing misrepresentations and omissions, the proposed class representative and Class Members purchased Class Vehicles and sustained economic harm because they purchased vehicles worth considerably less than represented. These misrepresentations diminished the value and increased the cost of vehicle ownership.

99.    The wrongful conduct of the Defendants in violation of the consumer protection laws of the states noted herein occurred within the limitations period set out in the respective statutes and/or the limitations period as tolled by the Defendants' conduct.

### THE INJURIES SUFFERED BY PLANTIFFS AND OTHER CLASS MEMBERS

100.    Plaintiffs and all purchasers and lessees of the Class Vehicles (who, as detailed below are the members of the putative classes) have suffered injury and been damaged by Defendants' unconscionable practices and breaches of its warranties.  Specifically, Plaintiffs and all members of the putative class paid for Class Vehicles that were represented and warranted to be operable for as long as the car was operable, but the cars they received had significant 3G-only limitations which eventually rendered numerous features inoperable.

101.    Plaintiffs and all members of the putative Classes received vehicles that were substantially less valuable than the vehicles that Defendants represented and warranted to them, due to the failure of Defendants to deliver a specific, bargained-for characteristic.

### CAUSES OF ACTION

### COUNT I
**Violation Of Magnuson-Moss Warranty Act, 15 U.S.C. §2310(d)1(A)**
**(On Behalf of the Nationwide Class)**

102.    Plaintiffs incorporate the foregoing paragraphs as if set forth fully in this Count.

103.    This claim is brought as a state law claim under 15 U.S.C. § 2310(d)(l)(A) and is before this Court as a supplemental state court claim for each of the state subclasses pursuant to diversity jurisdiction under CAFA.

104.    The proposed class representative and class members are consumers within the context of the Magnuson-Moss Warranty Act, 15 U.S.C.  § 2301(3).

105.    Cars are consumer products within the context of the Magnuson-Moss Warranty Act, 15 U.SC.  $ 2301(1).

106.    The Defendants are suppliers and/or warrantors within the context of the Magnuson-Moss Warranty Act, 15 U.S.C.  §§ 2301(4)-(5).

107.    The Defendants' express warranties are written warranties within the context of the Magnuson-Moss Warranty Act, 15 U.S.C.  $ 2301(6).  Cars implied warranties created by operation of state law are incorporated into the Magnuson-Moss Warranty Act as modified by§ 2308.

108.    The Defendants breached the express and implied warranties accompanying Class Vehicles as described in this complaint.

109.    The Magnuson-Moss Warranty Act provides a claim for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

110.    The Defendants' breach of their express and implied warranties was the direct and proximate cause of the proposed class representative and proposed class members' financial harm as more fully set out in the preceding warranty counts, and constitutes a violation of the Magnuson Moss Warranty Act.

111.    Affording Defendants a reasonable opportunity to cure their breach of written warranties for Class Vehicles would be unnecessary and futile.  The proposed class representative and class members have already attempted to secure coverage for their 3G-related repairs without success.

112.    At the time of sale or lease of each Class Vehicle, the Defendants knew, should have known, or were reckless in not knowing of their misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify

the situation and/or disclose the limitation, as described in this complaint.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate.

113.    The amount in controversy of each Plaintiff's individual claim exceeds the sum of $25.  The amount in controversy in this action exceeds the sum of $50,000, exclusive of costs and interest, computed on the basis of all claims to be determined in this lawsuit.

114.    Subaru had notice of its breach as alleged herein.

115.    Plaintiffs, individually and on behalf of the class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

116.    Wherefore, proposed class representative and proposed class members demand judgment against the Defendants including monetary damages, interest, costs and attorney's fees.

## COUNT II
## Unjust Enrichment
## (On Behalf Of The Nationwide Class)

117.    Plaintiffs incorporate the foregoing paragraphs as if set forth fully in this count.

118.    The Defendants benefited financially from their breaches of warranty and misrepresentations as described in this complaint.

119.    The proposed class representative and class members sustained monetary damages as described in this complaint.

120.    Allowing the Defendants to retain their monetary enrichment from their wrongful and unlawful acts would be unjust and inequitable.

121.    The proposed class representative and class members request that the Defendants disgorge their profits from their wrongful and unlawful conduct and that the Court establish a

constructive trust funded by the benefits conferred upon the Defendants as a result of their

wrongful conduct.  The proposed class representative and class members should be designated

beneficiaries of the trust and obtain restitution for their out-of-pocket expenses caused by the

Defendants' conduct.

122.    Wherefore, the proposed class representative and class members demand

judgment against defendant for damages, interest, costs and attorneys' fees.


### COUNT III
### Violations of the Michigan Consumer Protection Act
### Mich. Comp. Laws § 445.903 *et seq.*
### (On Behalf of the Michigan State Sub Class)

123.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

124.    This count is brought on behalf of the Michigan State Class against all

Defendants.

125.    Michigan State Class members are "person[s]" within the meaning of the Mich.

Comp. Laws § 445.902(1)(d).

126.    Defendants are "person[s]" engaged in "trade or commerce" within the meaning

of the Mich. Comp. Laws § 445.902(1)(d) and (g).

127.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair,

unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . .

." Mich. Comp. Laws § 445.903(1). Defendants engaged in unfair, unconscionable, or deceptive

methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that

goods or services have . . . characteristics . . . that they do not have. . . .;" "(e) Representing that

goods or services are of a particular standard . . . if they are of another;" "(i) Making false or

misleading statements of fact concerning the reasons for, existence of, or amounts of price

reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

128.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles.

129.    Michigan State Class members had no way of discerning that Defendants' representations were false and misleading because Michigan State Class members did not have access to Defendants' information.

130.    Defendants thus violated the Act by, at minimum: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

131.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Michigan State Class.

132.    Defendants knew or should have known that their conduct violated the Michigan CPA.

133.    Defendants owed the Michigan State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

A.    possessed exclusive knowledge that they were manufacturing, selling, and

distributing vehicles throughout the United States that did not perform as

advertised; and/or

B.    intentionally concealed the foregoing from Michigan State Class members.

134.    Defendants' concealment of the true characteristics of the Class Vehicles' were

material to the Michigan State Class.

135.    Defendants' unfair or deceptive acts or practices were likely to and did in fact

deceive reasonable consumers, including the Michigan State Class.

136.    Defendants' violations present a continuing risk to the Michigan State Class as

well as to the general public. Defendants' unlawful acts and practices complained of herein

affect the public interest.

137.    Michigan State Class members suffered ascertainable loss and actual damages as

a direct and proximate result of Defendants' misrepresentations and concealment of and failure

to disclose material information. Defendants had an ongoing duty to all their customers to refrain

from unfair and deceptive practices under the Michigan CPA. All owners of Class Vehicles

suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices

made in the course of Defendants' business.

138.    As a direct and proximate result of Defendants' violations of the Michigan CPA,

Michigan State Class members have suffered injury-in-fact and/or actual damage.

139.    The Michigan State Class seeks injunctive relief to enjoin Defendants from

continuing its unfair and deceptive acts; monetary relief against Defendants measured as the

greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in

the amount of $250 for each Michigan State Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

140.    The Michigan State Class also seeks punitive damages against Defendants because it carried out despicable conduct with willful and conscious disregard of the rights of others.

141.    Defendants intentionally and willfully misrepresented the reliability of the Class Vehicles and concealed material facts that only they knew—all to avoid the expense and public relations nightmare of correcting a flaw in the Class Vehicles. Defendants' unlawful conduct constitutes oppression and fraud warranting punitive damages.

**COUNT IV**
**Breach of Express Warranty**
**Mich. Comp. Laws §§ 440.2313 and 440.2860**
**(On Behalf of the Michigan State Sub Class)**

142.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

143.    This count is brought on behalf of the Michigan State Class against all Defendants.

144.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(d).

145.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

146.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

147.    As manufacturers of vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

148.    Defendants' warranties formed the basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

149.    Despite the existence of warranties, Defendants failed to inform Michigan State Class members that the Class Vehicles were defective and intentionally designed and manufactured.

150.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

151.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

152.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Michigan State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

153.    Accordingly, recovery by the Michigan State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

154.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed

material facts regarding the Class Vehicles. Michigan State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

155.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Michigan State Class members' remedies would be insufficient to make them whole.

156.    Finally, because of Defendants' breach of warranty as set forth herein, Michigan State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

157.    As a direct and proximate result of Defendants' breach of express warranties, Michigan State Class members have been damaged in an amount to be determined at trial.

**COUNT V**
**Breach of Implied Warranty of Merchantability**
**Mich. Comp. Laws §§ 440.2314 and 440.2860**
**(On Behalf of the Michigan State Sub Class)**

158.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

159.    This count is brought on behalf of the Michigan State Class against all Defendants.

160.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(d).

161.    With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

162.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

163.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862.

164.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Michigan State Class members have been damaged in an amount to be proven at trial.

**COUNT VI**
**Violation of the New York Deceptive Practices Act**
**N.Y. Gen. Bus. Law § 349 ("GBL")**
**(On Behalf of the New York Sub Class)**

165.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs.

166.    This claim is brought on behalf of the New York Class.

167.    New York class members are "persons" within the meaning of the GBL. N.Y. Gen. Bus. Law § 349(h).

168.    Each Defendant is a "person, firm, corporation or association or agent or employee thereof" within the meaning of the GBL. N.Y. Gen. Bus. Law § 349(b).

169.    133. Under GBL section 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce" are unlawful.

170.     In the course of Defendants' business, they failed to disclose and actively concealed that Class Vehicles are equipped with 3G compatible modems that would be phased out and "bricked" or rendered useless through 3G decommissioning. Defendants did so with the intent that consumers rely on its misrepresentation and concealment in deciding whether to purchase the Class Vehicles.

171.     By intentionally concealing the foregoing, while advertising Class Vehicles 3G network enabled features as functional, premium services, and fit for their ordinary and intended purpose, Defendants engaged in deceptive acts or practices in violation of GBL § 349.

172.     Defendants' deceptive acts or practices were materially misleading. The conduct was likely to and did deceive reasonable consumers about the true performance and qualities of the Class Vehicles.

173.     New York class members were unaware of, and lacked a reasonable means of discovering, the material facts that Defendants suppressed. Had Plaintiff and New York class members known the truth about the Class Vehicles, they would not have purchased them, or would not have paid as much for them as they did.

174.     Defendants' actions set forth above occurred in the conduct of trade or commerce.

175.     Defendants' misleading conduct concerns widely purchased consumer products and affects the public interest. Defendants' conduct includes unfair and misleading acts or practices that have the capacity to deceive consumers and are harmful to the public at large.

176.     Plaintiffs and New York class members suffered ascertainable loss as a direct and proximate result of Defendants' GBL violations. Among other things, Plaintiffs and New York class members overpaid for the Class Vehicles; suffered diminution of value of their Class

Vehicles; have lost use of safety features; and have suffered other injuries. These injuries are the direct and natural consequence of Defendant's material misrepresentations and omissions.

177.    New York State Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair and deceptive practices.

178.    Under the GBL, New York State Class members are entitled to recover their actual damages or $50, whichever is greater. Additionally, because Defendants acted willfully or knowingly, New York Class members are entitled to recover three times their actual damages.

**COUNT VII**
**Breach Of Implied Warranty Of Merchantability**
**N.Y. U.C.C. § 2-314**
**(Individually and on behalf of the New York State Sub Class)**

179.    Plaintiffs incorporate by reference each allegation as if set forth fully herein.

180.    Plaintiffs bring this claim individually and on behalf of the Class ("Class" for purposes of this Count).

181.    Subaru is a "merchant" and the Class Vehicles are "goods" as defined in N.Y. U.C.C. §§ 2-104 and 2-105.

182.    Pursuant to N.Y. U.C.C. § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the sale or lease of the product. Subaru impliedly warranted that the Class Vehicles were of a merchantable quality.

183.    By placing the Class Vehicles in the stream of commerce, Subaru impliedly warranted that all claims in their advertising and marketing of the Class Vehicles were true.

184.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale or lease and at all times thereafter, the Class Vehicles were defective

and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.

185.    Further, Subaru has refused to provide an adequate warranty repair, thus rendering the satisfaction of any notice requirement futile.

186.    Plaintiffs and the other Class Members suffered loss and injuries due to the defective nature of the Class Vehicles and Subaru's breach of the warranty of merchantability.

187.    At all times that Subaru warranted and sold the Class Vehicles, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Class Vehicles, and instead continued to issue false warranties. The Class Vehicles were defective when Subaru delivered them to their resellers, dealers, and distributors which sold the Class Vehicles, and the Class Vehicles were therefore still defective when they reached Plaintiffs and the Class.

188.    Subaru's resellers, dealers, and distributors are intermediaries between Subaru and consumers. These intermediaries sell Class Vehicles to consumers and are not, themselves, consumers of Class Vehicles, and therefore have no rights against Subaru with respect to Plaintiffs' and all other Class Members' acquisition of Class Vehicles. Subaru's warranties were designed to influence consumers who purchased and/or owned Class Vehicles.

189.    Plaintiffs' and each Class member's acquisition of the Class Vehicles suffices to create privity of contract between Plaintiffs and all other members of the Class, on the one hand, and Subaru, on the other hand; however, privity of contract need not be established nor is it required because Plaintiffs and the Class Members are intended third-party beneficiaries of contracts between Subaru and their resellers, authorized dealers, and, specifically, of Subaru's implied warranties.

190.    Subaru had notice of its breach as alleged herein.

191.    As a direct and proximate result of Subaru's breach of implied warranties of merchantability, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial.

**COUNT VIII**
**Violation of California's Consumers Legal Remedies Act**
**Cal. Civ. Code §§ 1750, et seq. ("CLRA")**
**(On Behalf of the California Sub Class)**

192.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

193.    This claim is brought on behalf of the California Sub Class.

194.    Defendants are a "person," under Cal. Civ. Code § 1761(c).

195.    Plaintiff is a "consumer," as defined by Cal. Civ. Code § 1761(d), who purchased or leased a Class Vehicle.

196.    Defendants' conduct, as described herein, in misrepresenting the characteristics, qualities, benefits and capabilities of the Class Vehicles, or omitting material information, violates the CLRA. Specifically, Defendants violated the CLRA by omitting material facts and failing to disclose known issues with the 3G modem, engaging in the following practices proscribed by Civil Code § 1770(a) in transactions that were intended to result in, and did result in, the sale or lease of the Class Vehicles:

- representing that the Class Vehicles have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

- representing that the Class Vehicles are of a particular standard, quality, or grade if they are of another;

- advertising the Class Vehicles with intent not to sell them as advertised; and

- representing that the Class Vehicles have been supplied in accordance with previous representations when they have not.

197.    Defendants violated the CLRA by selling and leasing Class Vehicles that they knew were equipped with a modem incapable of performing as advertised, unable to deliver the benefits, qualities, and characteristics described in advertisements and promotional materials because the inevitable decommissioning of cellular providers' outdated 3G network would render the vehicle modems nonfunctional. Defendants omitted from Plaintiff and other class members the material fact that Class Vehicles were sold with inadequate modems. This is a fact that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

198.    Defendants knew, at the time they sold Plaintiff his vehicle, of the material fact that the vehicles were equipped with a modem that would fail in the ways described above, and that the realities about the modem's capabilities substantially diminished the quality, performance, safety, and lifespan of Plaintiff's and other class members' vehicles. Defendants knew that the loss of viability of the modems was inevitable and certain based on pre-sale knowledge of planned obsolescence relating to the 3G network. Defendants' conduct in selling the Class Vehicles with a 3G-enabled modem knowing that it would be phased out, and omitting information about the same, was fraudulent, wanton, and malicious.

199.    Defendants' unfair and deceptive acts or practices were the foreseeable and actual cause of Plaintiff and other class members suffering actual damage on account of receiving a car that lacked modems that would not be rendered useless through phasing out of 3G network support.

200.     Plaintiff and the other class members paid for a car that was supposed to meet certain specifications. When they received a vehicle that did not conform to these specifications, and which fell below the standards set by and described in Defendants' representations, Plaintiff and the other class members were damaged on account of receiving a car worth less than as represented. Plaintiff and the other class members suffered diminution in the value of Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

201.     Pursuant to § 1782 of the CLRA, on November 7, 2022, Plaintiff notified Defendants in writing by certified mail of the particular violations of § 1770 of the CLRA and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act.

202.     Plaintiff does not seek damages by this claim at the present time. However, if Defendants fail to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the Act, Plaintiff will amend this Complaint to add claims for actual, punitive, and statutory damages, as appropriate.

203.     Pursuant to § 1780(d) of the Act, attached hereto as Exhibit A is the affidavit showing that this action has been commenced in the proper forum.

**COUNT IX**
**Violation of California's Unfair Competition Law**
**California Business & Professions Code § 17200, et seq. ("UCL")**
**(On Behalf of the California Sub Class)**

204.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

205.    This claim is brought on behalf of the California Sub Class.

206.    The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.

207.    In the course of conducting business, Defendants committed "unlawful" business practices by, among other things, making the representations and omissions of material facts, as set forth more fully herein, refusing to repair or replace the Class Vehicle's nonoperational 3G modem, and violating Civil Code §§ 1572, 1573, 1709, 1711, 1770(a)(5), (6), (7), (9), and (16), and Business & Professions Code §§ 17200, et seq., 17500, et seq., and the common law.

208.    In the course of conducting business, Defendants committed "unfair" business practices by, among other things, misrepresenting and omitting material facts regarding the characteristics, capabilities, and benefits of Class Vehicles. There is no societal benefit from such false and misleading representations and omissions, only harm. While Plaintiff and other class members were harmed by this conduct, Defendants were unjustly enriched. As a result, Defendants' conduct is "unfair" as it has offended an established public policy. Further, Defendants engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

209.    Defendants knew when Class Vehicles were first sold and leased that they were equipped with a modem that substantially diminished the quality, performance, and safety and lifespan of the vehicles. Through pre-sale communications with cellular providers regarding the eventual decommissioning of their 3G network, and Defendants' general knowledge of the telecommunications industry's upgrade to 4G and 5G technology, before the Class Vehicles were introduced to the market Defendants knew of the planned decommissioning of the Class

Vehicles' modem—i.e., that the inevitable decommissioning of the outdated 3G networks would render the vehicle modems nonfunctional.

210.    Plaintiff alleges violations of consumer protection, unfair competition, and truth in advertising laws in California, resulting in harm to consumers. Defendants' acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the UCL's "unfair" prong. There were reasonably available alternatives to further Defendants' legitimate business interests other than the conduct described herein.

211.    The UCL also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendants committed "fraudulent business act[s] or practices" by, among other things, prominently making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding the safety, characteristics, and production quality of the Class Vehicles.

212.    Defendants' actions, claims, omissions, and misleading statements were also false, misleading, and likely to deceive the consuming public within the meaning of the UCL.

213.    Plaintiff was deceived as a result of his reliance on Defendants' material representations and omissions, which are described above. Plaintiff suffered injury in fact and lost money as a result of purchasing a deceptively advertised Class Vehicle by paying more than he should have and expending time, effort, and money to attempt to repair or replace his Class Vehicle's modem and incurring other consequential inconvenience, aggravation, damages, and loss of money and time.

214.    Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

215.    Plaintiff, on behalf of himself and all others similarly situated, seeks restitution from Defendants of all money obtained from Plaintiff and the other members of the Class collected as a result of unfair competition, an injunction prohibiting Defendants from continuing such practices, corrective advertising, and all other relief this Court deems appropriate, consistent with Business & Professions Code § 17203.

**COUNT X**
**Violations of the Washington Consumer Protection Act**
**Wash. Rev. Code § 19.86.020 *et. seq.***
**(On Behalf of the Washington State Sub Class)**

216.    Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

217.    This count is brought on behalf of the Washington State Class against all Defendants.

218.    Washington State Class members are "person[s]" within the meaning of the Wash. Rev. Code § 19.86.010(1).

219.    Defendants are "person[s]" engaged in "trade and commerce" within the meaning of the Wash. Rev. Code § 19.86.010(1) and (2).

220.    The Washington Consumer Protection Act ("Washington CPA") protects consumers against "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" Wash. Rev. Code § 19.86.020. Defendants engaged in unfair and deceptive acts or practices prohibited by the Washington CPA.

221.    In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles.

222.    Washington State Class members had no way of discerning that Defendants' representations were false and misleading because Washington State Class members did not have access to Defendants' information.

223.    Defendants thus violated the Washington CPA by, at minimum; representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

224.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Washington State Class.

225.    Defendants knew or should have known that their conduct violated the Washington CPA.

226.    Defendants owed the Washington State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

      a.  Possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised; and/or

      b.  Intentionally concealed the foregoing from Washington State Class members.

227.    Defendants' concealment of the true characteristics of the Class Vehicles was material to the Washington State Class.

228.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Washington State Class.

229.    Defendants' violations present a continuing risk to the Washington State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

230.    Washington State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Washington CPA. All owners of Class Vehicles suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

231.    As a direct and proximate result of Defendants' violations of the Washington CPA, Washington State Class members have suffered injury-in-fact and/or actual damage.

232.    The Washington State Class seeks injunctive relief to enjoin Defendants from continuing its unfair and deceptive acts, monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $7,500 for each Washington State Class member; reasonable attorneys' fees; and any other just and proper relief available under Wash. Rev. Code § 19.86.140.

233.    The Washington State Class also seeks punitive damages against Defendants because it carried out despicable conduct with willful and conscious disregard of the rights of others.

234.    Defendants intentionally and willfully misrepresented the reliability of the Class Vehicles and concealed material facts that only they knew – all to avoid the expense and public relations nightmare of correcting a flaw in the Class Vehicles. Defendants' unlawful conduct constitutes oppression and fraud warranting punitive damages.

**COUNT XI**
**Breach of Express Warranty**
**Wash. Rev. Code §§ 62A.2-313 and 62A.2A-210**
**(On Behalf of the Washington State Sub Class)**

235.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

236.    This count is brought on behalf of the Washington State Class against all Defendants.

237.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and "seller[s]" of motor vehicles under § 62A.2-103(1)(d).

238.    With respect to leases, Defendants are and were at all relevant times "lessor[s]" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

239.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

240.    As manufacturers of vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

241.    Defendants' warranties formed the basis of the bargain that was reached when consumers purchased or leased Class Vehicles.

242.    Despite the existence of warranties, Defendants failed to inform Washington State Class members that the Class Vehicles were defective and intentionally designed and manufactured.

243.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship, Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

244.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

245.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Washington State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

246.    Accordingly, recovery by the Washington State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

247.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding to Class Vehicles. Washington State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

248.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Washington State Class members' remedies would be insufficient to make the whole.

249.    Finally, because of Defendants' breach of warranty as set forth herein, Washington State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class

Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

250.    As a direct and proximate result of Defendants' breach of express warranties Washington State Class members have been damaged in an amount to be determined at trial.

**COUNT XII**
**Breach of Implied Warranty of Merchantability**
**Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212**
**(On Behalf of the Washington State Sub Class)**

251.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

252.    This count is brought on behalf of the Washington State Class against all Defendants.

253.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and "seller[s]" of motor vehicles under § 62A.2-103(1)(d).

254.    With respect to leases, Defendants are and were at all relevant times "lessor[s]" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

255.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

256.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

257.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Washington State Class members have been damaged in an amount to be proven at trial.

## COUNT XIII
### Violations of the Florida Deceptive and Unfair Trade Practices Act
### Fla. Stat. Ann. § 501.201 *et. seq.*
### (On Behalf of the Florida State Sub Class)

258.     Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

259.     This count is brought on behalf of the Florida State Class against all Defendants.

260.     Florida State Class members are "consumer[s]" within the meaning of the Fla. Stat. Ann. § 501.203(7).

261.     Defendants are engaged in "trade or commerce" within the meaning of the Fla. Stat. Ann. § 501.203(8).

262.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") protects consumers against "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" Fla. Stat. Ann. § 501.204(1). Defendants engaged in unfair and deceptive acts or practices prohibited by the FDUTPA.

263.     In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles.

264.     Florida State Class members had no way of discerning that Defendants' representations were false and misleading because Florida State Class members did not have access to Defendants' information.

265.     Defendants thus violated the FDUTPA by, at minimum; representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; and representing that the

subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

266.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Florida State Class.

267.    Defendants knew or should have known that their conduct violated the FDUTPA.

268.    Defendants owed the Florida State Class a duty to disclose the illegality and public health risks, the true nature of the Class Vehicles, because Defendants:

   a. Possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised; and/or,

   b. Intentionally concealed the foregoing from Florida State Class members.

269.    Defendants' concealment of the true characteristics of the Class Vehicles was material to the Florida State Class.

270.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Florida State Class.

271.    Defendants' violations present a continued risk to the Florida State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

272.    Florida State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of a failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the FDUTPA. All owners of Class Vehicles suffered

ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

273.    As a direct and proximate result of Defendants' violations of the FDUTPA. Florida State Class members have suffered injury-in-fact and/or actual damage.

274.    The Florida State Class seeks injunctive relief to enjoin Defendants from continuing its unfair and deceptive acts, monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Florida State Class member; reasonable attorneys' fees; and any other just and proper relief available under Fla. Stat. Ann. § 501.2075.

275.    The Florida State Class also seeks punitive damages against Defendants because it carried out despicable conduct with willful and conscious disregard of the rights of others.

276.    Defendants intentionally and willfully misrepresented the reliability of the Class Vehicles and concealed material facts that only they knew – all to avoid the expense and public relations nightmare of correcting a flaw in the Class Vehicles. Defendants' unlawful conduct constitutes oppression and fraud warranting punitive damages.

## COUNT XIV
### Breach of Express Warranty
### Fla. Stat. Ann. §§ 672.313 and 680.21
### (On Behalf of the Florida State Sub Class)

277.    Plaintiffs re-allege and incorporate by reference all preceding allegations as though fully set forth herein.

278.    This count is brought on behalf of the Florida State Class against all Defendants.

279.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Fla. Stat. Ann. § 672.104(1) and "seller[s]" of motor vehicles under § 672.103(1)(d).

280.    With respect to leases, Defendants are and were at all relevant times "lessor[s]" of motor vehicles under Fla. Stat. Ann. § 680.1031(1)(p).

281.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. Ann. §§ 672.105(1) and 680.1031(1)(h).

282.    As manufacturers of vehicles, Defendants were required to provide these warranties to purchasers or lessees of Class Vehicles.

283.    Defendants' warranties formed the bases of the bargain that was reached with consumers purchased or leased Class Vehicles.

284.    Despite the existence of warranties, Defendants failed to inform Florida State Class members that the Class Vehicles were defective and intentionally designed and manufactured.

285.    Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

286.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

287.    Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Florida State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

288.    Accordingly, recovery by the Florida State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

289.    Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Vehicles, they knew that the Class Vehicles were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding to Class Vehicles. Florida State Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

290.    Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Florida State Class members' remedies would be insufficient to make the whole.

291.    Finally, because of Defendants' breach of warranty as set forth herein, Florida State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

292.    As a direct and proximate result of Defendants' breach of express warranties Florida State Class members have been damaged in an amount to be determined at trial.

**COUNT XV**
**Breach of Implied Warranty of Merchantability**
**Fla. Stat. Ann. §§ 672.314 and 680.212**
**(On Behalf of the Florida State Sub Class)**

293.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

294.    This count is brought on behalf of the Florida State Class against all Defendants.

295.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Fla. Stat. Ann. § 672.104(1) and "seller[s]" of motor vehicles under § 672.103(1)(d).

296.    With respect to leases, Defendants are and were at all relevant times "lessor[s]" of motor vehicles under Fla. Stat. Ann. § 680.1031(1)(p).

297.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. Ann. §§ 672.105(1) and 680.1031(1)(h).

298.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Fla. Stat. Ann. §§ 672.314 and 680.212.

299.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Florida State Class members have been damaged in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief in the form of an order as follows:

a.    Certifying this action as a class action under Federal Rule of Civil Procedure 23, and appointing Plaintiffs as class representative and [his/her] attorneys as class counsel;

b.    Awarding actual damages to Plaintiffs and the members of the class;

c.    Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d.    Awarding such other and further relief which the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable pursuant to Federal Rule of Civil

Procedure 38.

Dated: October 6, 2023                    /s/*Lisa J. Rodriguez*

Lisa J. Rodriguez
**DILWORTH PAXSON LLP**
457 Haddonfield Road, Suite 700
Cherry Hill, NJ 08002-1165
Tel: (856) 674-1926
 lrodriguez@dilworthlaw.com


**WEXLER BOLEY & ELGERSMA LLP**
Kenneth A. Wexler
Kara A. Elgersma
Margaret L. Shadid
311 S. Wacker Dr., Suite 5450
Chicago, IL 60606
Telephone: 312-346-2222
Facsimile: 312-346-0022
kaw@wbe-llp.com
kae@wbe-llp.com
ms@wbe-llp.com


**WALLACE MILLER**
Edward A. Wallace
Mark R. Miller
150 N. Wacker Dr., Suite 1100
Chicago, IL 60606
Telephone: 312-261-6193
Facsimile:  312-275-8174
eaw@wallacemiller.com
mrm@wallacemiller.com